All right, let's see. This is case number 4-13-0512. People of the State of Illinois v. Brett Wilson. Attorney Ryan is here on behalf of the appellant. Attorney McClain is here on behalf of the appellee. Mr. Ryan, are you ready to proceed? Yes. All right, you may do so. May it please the court, counsel, I'm Martin Ryan from the Office of the State Appellate Defender and I represent Brett Wilson. This was a closed case. In this case, we have a woman named Belinda Lovell who had six children. Three with her first husband, Bill. Brett, my client, Bianca and Brooklyn. They got divorced and she had three more with her second husband, Tom. J-H-A-H-N-T-H, the three alleged victims in this case. Tom and Belinda also got divorced. Tom became angry when Belinda reunited with Bill and she got an order of protection against Tom in May of 2010. A bitter custody battle over the three youngest children ensued. In June of 2010, Tom brought his three children to Detective Burns with the allegation that Brett put his hand on J-H's mouth. The children denied it. Detective Burns found the allegations were untrue and Tom was angry that Burns did not even call Brett in for questioning. After that, at least as charged, the offenses underlying counts one through three were alleged to have occurred in October of 2010. In May of 2011, Tom brings the children for a second time into Detective Burns. This time, Bill is alleged to have spanked J-H. However, A-H and J-H don't corroborate this. Detective Burns asks them if they need to talk about anything else. If anything else is going on, they both say no. Around December 20, 2011, the judge presiding over the custody dispute appoints a guardian ad litem to determine basically the best interest of the children. About a dozen days later, Tom brings these three children in again for a third time to Detective Burns. And this time, they all say the same thing, that Brett made them suck his wee-wee. Detective Burns, of course, can't just pass this one off as an unfounded allegation. He has to look further. He brings in Bianca and Brooklyn, who are also interviewed cold with no warning as to why they're there. And they deny that they ever saw their brother do anything, that anything happened to them, including at times when allegedly things happened to both them and A-H. Around several weeks later, Brett is arrested and indicted by February of 2012. The next month, the judge learns of Brett's arrest and awards Tom custody of the three children. Ultimately, after a jury trial, Brett is convicted of five counts of predatory criminal sexual assault. And I believe a somewhat troubled judge imposes the mandatory life without parole sentence that would be required under subsection B-2 of the predatory criminal sexual assault statute, which is simply two or more victims regardless of anything else. In this case, I believe there were some serious trial errors in this close case, which I believe was also a credibility match, essentially one side of the family versus the other. The States case rested solely on the statements of Tom's three children, and two of the counts, the last two, on the word of A-H alone. Tom clearly had a history of bringing the children in to make false claims to the police about Brett and or Bill. And the allegations of Tom's children are contradicted by the other siblings who do not live with Tom, family members and even a couple of non-family members. There's no forensic evidence that corroborates and there's no confession from Brett. However, the State improperly attempted to convert Brett's denials into a sort of confession with a human lie detector argument that Brett was lying because of his body language. And the prosecutor contrasted Brett's body language with all five younger siblings. Also, even though Brooklyn was interviewed the same day under the same circumstances, and she denied Brett's guilt, and she was interviewed just as Tom's three children were, and those interviews were taped, that interview was taped, when she testified at trial, the prosecutor cross-examined her on the topic of she wanted Brett to come home. She was trying to protect Brett, essentially implying that she had a motive to fabricate. When defense counsel sought to play Brooklyn's video, he was denied the opportunity to do so. And of course, defense counsel wanted that video in for the same reason the prosecutor wanted in the video of the three of Tom's children, in that you have a child being interviewed. It's a powerful image for the jury to see. And I believe that a new trial is warranted for those two issues. However, in the alternative, I'm assuming that this court in the alternative does not grant Brett a new trial. His mandatory life without parole sentences are unconstitutional. And if you'll pardon me, sometimes I refer to that as LWOP as jargon. So if I say LWOP, that's what I mean. Graham v. Florida could not be more clear. Under the Eighth Amendment, for non-homicide offenses, someone who commits an offense under the age of 18 cannot receive a sentence of life without parole. This is in contrast to homicide offenses, which was Miller v. Alabama, where they can, it just cannot be mandatory. So under this case, as charged, Brett was 17 years old through counts 1, 2, and 3. His mandatory life without parole sentences have to be vacated under Graham. Turning to counts 4 and 5, which as charged were alleged to have occurred a matter of months after Brett's 18th birthday. Those two counts allege the same victim, A.H. Under subsection B.1.2 of the predatory criminal sexual assault statute at issue here, which has the mandatory life without parole term, there needs to be two victims. So in order to use that statute, in order to make Brett eligible for life without parole, they had to essentially borrow a victim from when he was 17. Not only that, but there was no, unlike say the Dunnigan case I cited in the supplemental brief, there was no intervening conviction, as is more typical when someone gets a life without parole sentence based on repeated criminal misconduct. So we have essentially, in order to uphold, I think, for this, you know, for this court to uphold on Eighth Amendment grounds, the life without parole sentences in counts 4 and 5, this court would have to, I think, disregard the diminished culpability of youth that's underlying Graham and Miller, and use conduct that was supposedly committed less than a year earlier, and just, you know, and then use conduct just months after the, after his 18th birthday allegedly. And with no intervening convictions in the meantime, I believe this would be a super rigid interpretation of Graham to allow that kind of, that kind of reaching back to juvenile conduct in a case where there was no intervening conviction. The proportionate penalties analysis, which I raised in subsection C, or argument C of the supplemental brief, has an even wider, a slightly wider reach under Clemens. Under the proportionate penalties, not only, of course, do we consider the seriousness of the offense, but there's also the individual circumstances of the offender, as per Huddleston and the Gibson case I cited as supplemental authority. You know, and in addition to the things that apply to the Eighth Amendment analysis, Brett was, you know, allegedly 17 or 18 at all times, had no prior convictions, was a high school graduate, was supposedly about to enjoy, to join the Army. He was the oldest kid, so I guess the task of babysitting fell to him. In contrast to Mr. Huddleston, whose natural life for predatory criminal sexual assault against two or more victims was upheld by the Illinois Supreme Court, was 36, a professional educator who preyed on his elementary school students. He had a prior indecent exposure conviction, and he kept a cabinet full of porn in his desk or in a cabinet in the school. Obviously, this case is far, far better than that. I would also note that in its argument, in the proportionate penalties argument, the state neither addressed Graham nor Dunnigan, which again underscores the importance of intervening convictions. And lastly, in the argument B of the supplemental brief, I raised an apprendic challenge, the gist of which is that, and Graham came down after subsection 1.B was enacted, effectively changing the law for purposes of the Eighth Amendment and now prohibiting life without parole sentences for juveniles who commit non-homicide offenses. Here, though the trial happened a few years after Graham, no one gave any indication that they knew that it mattered that 18 was the launching point for natural life versus the ordinary term of years for predatory criminal sexual assault. The jury wasn't instructed on that. They were instructed that he had to be at least 17, because at the time, that was the bottom age of the offense. So in terms of any dates, influx, it didn't matter to the jury. He just had to be 17 for that. And I believe that this case is analogous to cases where there is an enhancement factor based on the victim's age, which can be harmless. In the classic case, you'll have a 75-year-old man who says, I was beaten about a public way, and they fail to give the jury an instruction that he gets an extended term if he finds that he's over 60. But where nobody's disputing it, and it's not close, and it's not in flux, it's harmless. In this case, we have alleged conduct that is by the charges is allegedly just months after he turns 18. It's uncorroborated testimony from a single victim, and at times disputed by the other evidence at trial. And I know that our Illinois Supreme Court has held that where an apprendee issue is not raised in the trial, which it was not here, the harmless error standard is the plain error. I do believe that given the closeness of the events in time, that this was both plain error under the closely balanced prong, and also under the substantial rights prong, given that no one in the courtroom seemed to know that it mattered whether he was 17 or 18 for purposes of a chance to get out from prison or being warehoused for the rest of his life. In summary, I would ask that Brett be given a new trial, or alternatively, that this court vacate all five of his life without parole sentences, and remand for sentencing under the ordinary range for predatory criminal sexual assault. Are there no questions? I have a question. So is it your position that you should never be able to utilize a prior juvenile adjudication to bump a person up to be eligible for natural life? No. I think if in the worst case than what I have here comes down, let's say he's 17 years old, commits these, stops, gets convicted, or some criminal sexual assault, doesn't have to be predatory, any sexual assault will do, does his time in prison, and then 10, whatever, a few years later, commits this predatory criminal sexual assault afterwards? No. That's B2. That's the classic recidivism natural life provision, which has been enacted, I think, longer than 1.2. So I do believe that if someone is given at least one chance at rehabilitation, I think it would likely pass muster. Whether I would take that position if I had that case is a different issue. Way to cover yourself. Yes. So now, what about with the two or more victims, or at least two victims, should you ever be able to borrow from the juvenile adjudication for that? Well, I think that's basically an overlapping or similar question. So the first question you asked was in terms of eligibility, and the second was, yes, but can it be aggravating? Is that what you, I mean, yes, I would think that in a resentencing hearing where this judge has discretion to fashion whatever sentence, I think it's Judge Drzewski, whatever sentence that Judge Drzewski thought was appropriate for Brett, I'm not saying that having committed this, having a prior conviction is always going to be aggravation as a reason to use subsequent conduct to give it a higher sentence within the range. I don't think it's, I don't think there's any immunity from that as part of Graham. Thank you. Any further questions, Your Honor? I'll take it. Thank you. Thank you. Ms. Ryan, you have another chance on rebuttal. Ms. McClain. Ms. McClain. May it please the Court? Yes, ma'am. Briefly, I would argue that this case was not close. There were three victims, all stepchildren of, or step sisters, step two step brothers of the defendant. Ms. McClain, I'm getting older. My hearing's not as good. Remember, though, that doesn't amplify, that just records, so if you could put your voice up a little bit. I would argue that this was not a close case. There was remarkable, consistent recitation of factual circumstances, and the detail of the testimony and the statements by the three victims were almost identical. The statements were corroborated by the opportunity to commit the crimes presented in the defendant's statement and the testimony of defense witnesses, and there was also the defendant's changing story, indicating a consciousness of guilt. The State is arguing that this was not a close case by any means, and any error in evidentiary arguments the defendant has raised are harmless. The first argument is whether the prosecutor's closing argument commenting on the credibility of the defendant was proper, and the State is maintaining it was based on evidence and reasonable inferences therefrom. During the recross examination of the defendant, the prosecutor asked the defendant, in the interview, that was you surprised? The defendant says, I don't show emotion very often. The prosecutor asks, in your reactions to him telling you what your little sister and little brother told him happened, that was you not surprised? The defendant answers, I was not surprised, but I was in shock. Then, during closing argument, the prosecutor played a portion of the defendant's interview and questioned whether the defendant was shocked at being arrested. The prosecutor described the defendant as stone cold without emotion, exactly what the defendant had just said, and stated the defendant was not surprised by the allegations. The defendant had testified, I was not surprised. Therefore, we're arguing that the closing argument was based on evidence and reasonable inferences therefrom, and that the human lie detector argument is not applicable to this case. In addition, there was no preservation of this error in the post-trial motion, so we're arguing that it was forfeited. Further, the jury was repeatedly admonished that closing arguments are not evidence, and that arguments not based on the evidence are to be disregarded, and that we've reduced any prejudicial effect of the closing argument, and the prosecutor's argument was not overly extensive. As for the other evidentiary error raised by defendants concerning Brooklyn's prior consistent statement as rehabilitation evidence, the state would argue that any motive for Brooklyn to fabricate, such as her desire to have an intact family and her brother not to get into trouble, predated her initial statement to the police. That motive existed whether or not the defendant had been charged, or whether or not she knew of the potential charges. Therefore, Brooklyn's interview was not rehabilitation evidence, and the court properly ruled on that. Moreover, Brooklyn was allowed to testify that she told the detective what she had testified in court, just not the details, and they did not play the interview. Further, there's no reasonable probability that the jury would have acquitted the defendant absent any error in this admission, or denial of the admission of Brooklyn's statement. As for sentencing, the state concedes that the first three counts of predator-to-criminal sexual assault committed when he was a juvenile, the sentences of mandatory life without parole, are unconstitutional under Graham and Miller, and that the case must be remanded for resentencing on counts one to three. And I further admit that Graham precludes natural life sentences for these non-homicide offenses for the juvenile, so on remand, the normal sentencing limits apply of six to sixty years' imprisonment on those first three counts. However, his mandatory natural life sentences for counts four and five, alleging predator-to-criminal sexual assault, are valid, as he committed those offenses when he was eighteen years old, and therefore as an adult. The court properly considered the two other victims, even though those offenses against those two victims were committed when he was seventeen, and sentencing him to natural life on counts four and five. In Roper v. Simmons, the court drew a line for adulthood at the age of eighteen. The court stated that the qualities that distinguish juveniles do not disappear when an individual turns eighteen. By the same token, some under eighteen have already attained the level of maturity some adults will never reach. However, the court stated a line must be drawn, and the age of eighteen is the point where society draws a line between childhood and adulthood. In Roper, in that case, the court concluded that that was the age at which a person could be death eligible. In this case, the fact that there were only a few months between when he was a juvenile and the adult offenses is irrelevant. The court drew the line at the age of eighteen, the defendant was an adult when he committed counts four and five, and therefore Graham and Miller are inapplicable. As for the defendant's argument that there was no intervening conviction between the defendant's criminal acts to allow him a chance to reform, he's being sentenced as an adult, not as a juvenile. The rehabilitative consideration, such as juvenile traits not being fully formed, are no longer applied once you turn eighteen. The diminished culpability of youth is not a consideration since he's now an adult. As for the defendant's argument giving him a chance to reform and therefore needing a conviction, the legislature weighed the rehabilitative potential of offenders and determined that multiple victims, two or more, justifies a natural life sentence. The legislature determined that the fact that there are multiple victims indicates a tendency toward recidivism and a lack of rehabilitative potential. The legislature determined that prior convictions are not necessary to find a decreased rehabilitative potential. The punishment reflects the tendency of sex offenders to repeat their offenses and the frightening and high risk of recidivism. In Huddleston, the court stated that sex offenders are much more likely than any other type of offender to be arrested for a new rape or sexual assault. I'd also add that the Constitution does not require that the possibility of rehabilitative potential be given greater weight than the seriousness of the offense. In the Oates case, a fifth district case cited in my brief, they reject the defendant's argument concerning the distinction between repeat offenders who are convicted and those who just have multiple offenses but no prior convictions. The court stated that the defendant's argument ignored the tendency of sex offenders to repeat their offense and the frightening and high risk of recidivism. As for the defendant's apprende argument, that issue is forfeited and plain-air does not apply in this case where the presumptively prejudicial error prong does not apply and the evidence adduced was not closely balanced as to the age of the defendant or the date of death. In fact, when interviewed, he admitted he was 18 and that he was born and gave his birthday. A.H. testified that one incident occurred on her birthday. Her birthday was June 16th. The other incident occurred at their new house in Fisher. The family had moved two to three months prior to her interview, which occurred on January 1, 2012. So the timing is pretty, the proof of timing is pretty overwhelming. However, we'd argue that there was no apprendia violation because the United States Supreme Court recognized youth as a mitigating circumstance, justifying excluding youthful recidivists from unduly harsh penalties. This was not an aggravating factor in the sentencing scheme or a statutory factor. I think if this Court would find an apprendia violation, that would mandate proof of everyone's age in every case. Otherwise, they might be a juvenile. Defendant's sentence also does not violate the Proportionate Penalties Clause. In Huddleston, our Supreme Court has already ruled on this issue and held that the mandatory life sentence predecessor to this section involved in this case did not violate the Proportionate Penalties Clause. You cited Roper. Roper talks about that line that has to be drawn. How does it fit with public policy or Roper or cases that follow to punish the juvenile for what he does as an adult? How do you make that second victim someone who was a victim when the perpetrator was a juvenile? In one sense, it's arbitrary, but in another sense, that's what the Court has told us. 18 is the line. If it was 17 years, 11 months, and 29 days, the same argument would apply. Just as it does in statutes of limitation, anything that draws a line, the line is there and you have to live with the arbitrariness of it at times. I think you have to keep in mind that you're sentencing for an adult offense. Even though you're using juvenile crimes, you're sentencing for an adult offense. And that line was drawn at 18. So he's an adult. I agree. But the victims who are part and parcel of the substance of the offense are singular. One victim. One victim is an adult. Multiple victims is a juvenile. That's aggravating, but does it meet the standard of the statute, two or more victims? I believe it does. There is definitely more than one victim. So the line, it gets squiggly or we erase part of it? Well, that's what the statute talks about. It's irrespective of if it happened at the same time or the same victim. I can't recall the exact language, but there is language that addresses that. Yes. It's regardless of whether the offense occurred as a result of the same act or of several related or unrelated acts. So it doesn't have to happen at the same time according to the statute. It could be unrelated and related. And it's really silent. It doesn't speak to whether or not you can use a juvenile adjudication because that's really what it would have been technically since he was under 18. Yes, but he was transferred to adult court. So it's not technically an adjudication. It's a conviction. Are there any other questions? No, I'll say no more. I just asked the court to affirm. Thank you. Thank you, counsel. Mr. Ryan, any rebuttal? Yes, sir. I suppose probably going backwards chronologically for the state's arguments, if we're looking at the cold statute, that cold statute is also unconstitutional in part plainly. Under Graham, because that statute doesn't have any limits. It allows a 17-year-old to get natural life. There's two or more victims when you're 17. I don't think it's enough to say that the legislature has a judgment when we're talking about a constitutional issue. Also, going backwards, as for the Apprendi argument, the fact that the youth is not an aggravating factor ignores both Graham establishing 18 as the age for LWOP, life without parole for non-homicide offenses for juveniles, and Sadazan, which says any fact that increases the maximum. In this case, because of Graham, the maximum can get increased if the accused is at least 18. And I disagree that this would mandate Apprendi reversal in every case. It would mandate a reversal in almost no cases because, like the example I gave with the 75-year-old guy who got hit and the thing is 60, you've got a 30-year-old person who says they didn't prove I was 18. It's going to be harmless there. If you go and look at the age factor cases back when Apprendi was the big issue in the early 2000s, they're all harmless because someone's always five or six years later. The state on the proportionate penalties argument, the state cites to Oates. As I pointed out in my reply brief and not responded to by the state, there's no indication in the Oates' opinion that the accused there was ever a minor at the time of any of the offenses. And moreover, like the state, Oates seems to misread Huddleston as a blanket holding that subsection 1.2b is always constitutional, regardless of the individual circumstances of the offender, when that is not what Huddleston held. And as the Gibson case I cited, you can consider individual circumstances. Oh, I apologize. Back on the Apprendi issue, the state's second prong argument is that there's never, that it's not plain error in the second prong forever or under any circumstances based on NITS, which does not hold that. It never issued a blanket ruling. NITS said that the finding of brutal and heinous there by a judge was not harmless or was not second prong plain error. And I believe the case involved a fairly brutal murder. That's akin to the 75-year-old guy and the cutoff is 60. When it's not close, like it's close here, when it's not close, it's going to be harmless error. And the vast majority of times, it's going to be. As to the trial issues, as to the human lie detector argument, the state forfeited its forfeiture argument by failing to contest this when defense counsel brought it up at the post-trial hearing. Also, I would also argue that the instruction given would not have fixed this problem because a jury being told that arguments are not evidence does not mean that arguments can't be persuasive, especially when here, the argument's not based on any evidence. There's no evidence to be contrary to. And as for the error in not playing the video of Brooklyn's interview, the state basically claims a basically from birth pre-existing motive to cover, which is extremely convenient for the state because that means if you have a group of children, some of whom implicate the defendant and some of whom exonerate the defendant, only the ones who implicate him get played. Because everybody else doesn't qualify under 115.10, and then you can always say their video doesn't come in because they have a pre-existing motive to cover. So it's like a natural filter that favors the state, even when you have two interviews on the same day from the same siblings under equally reliable circumstances, if not, I would say more reliable in Brooklyn's case, because I don't think she had a parent that was coaching her. Are there no further questions, Your Honors? I don't see any. Thank you. Thank you, Counsel. We'll take this matter under advisement and be in recess.